**SO ORDERED.**

**SIGNED this 9th day of June, 2016.**



Robert E. Nugent
United States Chief Bankruptcy Judge

___

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>PRUCRES, INC.,<br><br>Debtor. | Case No. 14-10284<br>Chapter 11 |

### ORDER GRANTING PROCEEDS MOTION AND
### OVERRULING OBJECTION TO CLAIM NO. 3

Two matters are before the Court today: debtor Prucres Inc.'s Motion to Determine the Distribution of the Proceeds of the sale of a 93-acre tract of undeveloped real estate in Santa Clarita, California (Proceeds Motion) and Prucres' Objection to MP Property Partners-90 Acres, LLC's (MP) Claim No. 3.[1] Prucres and

___

[1] Dkt. 208 (Proceeds Motion) and Dkt. 207 (Objection to Claim). At the evidentiary hearing held on May 4, 2016, debtor Prucres appeared by its attorney Nicholas R. Grillot and creditor MP appeared by its attorney J. Michael Morris. The United States Trustee also appeared by Richard Wieland.

1

MP are tenants in common in the 93-acre tract (hereafter "Property") and each signed a Tenancy in Common Agreement (TICA) on about November 1, 2005, prior to the closing of their acquisition on November 3, 2005. Both the TICA and the tenants' deed to the Property reflect that each owns a 50% undivided interest. But the TICA also contains specific terms that provide, in part, that upon the sale of the Property, each party may first recover its respective acquisition costs before the 50-50 division of "profits" begins. The matters are complicated by MP's having loaned money to Prucres in 2008 on an unrelated deal, a debt that is secured by a deed of trust that encumbers Prucres' share of the Property. Debtor's confirmed plan of reorganization provides for the sale of the Property and this Court's determination of each party's interest in the proceeds by interpreting the TICA and by allowing or disallowing MP's secured claim. One thing this Court won't need to do is divide the "profits"—the parties bought the land for $950,000, but it recently sold for only $800,000 to the Santa Clarita Water Company.

The closing of that sale has been delayed pending the hearing and resolution of these two open issues because MP wishes its share of the property's proceeds to be paid to a qualified intermediary in connection with an Internal Revenue Code § 1031 like-kind exchange. I conducted a two day hearing and, after reviewing the numerous exhibits and the testimony of Messrs. Mitelhaus, McDonnell, and Reno, conclude as follows.[2] First, Prucres and MP are each entitled to recover their ratable share of the sales proceeds, after deduction of the direct costs of sale in proportion to what each

---

[2] Mr. Reno's testimony was presented by way of the parties' designations of his deposition testimony per Fed. R. Bankr. P. 9014(c) and 7032 and Fed. R. Civ. P. 32.

paid to acquire the Property. MP paid $758,000 (79.29%) and Prucres paid $198,000 (20.71%).[3] The only offer the parties received was for $800,000. At closing, MP shall be entitled to receive up to $634,320 and Prucres $165,680, less, of course, their respective ratable shares of the direct sales costs.[4] Second, MP's claim is allowed in the amount of $179,526.15, which claim is secured by a lien on Prucres' share of the Property to the extent of its value and, at closing, Prucres is directed to pay its share of the sales proceeds to MP up to that amount.

**FINDINGS OF FACT**

**The Acquisition and the Tenancy in Common Agreement (TICA).**

Prucres, Inc. is the debtor in this case and its principal owner is Robert Mitelhaus. Educated as a minister, Mitelhaus is also a real estate broker and, in 2005, was selling and developing real estate for franchisees in Southern California. In 2005, he located a 93 acre tract of undeveloped land located near Santa Clarita, California, a city north of Los Angeles. Mitelhaus believed this land would make an ideal residential development that could be subdivided into two- to twelve-acre tracts. Seeking funding to complete the purchase, Mitelhaus offered John McDonnell, a real estate investor, an opportunity to invest in and acquire the land as a tenant in common. After exchanging a series of draft agreements in the fall of 2005, McDonnell and Mitelhaus, as principals of their respective entities MP and Prucres, signed the TICA dated October 28, 2005 and incorporated an untitled agreement dated

---

[3] *See* closing statement, Ex. C, p. 1. The nominal sales price was $950,000, but it appears the parties also paid in $6,000 in prorated ad valorem tax.
[4] *See* Order Approving Sale, Dkt. 210.

3

November 1, 2005.[5] Both parties agree that these documents should be read as one memorandum.

As executed, the TICA specified that Prucres and MP would purchase the Property for $950,000. MP would contribute $750K and Prucres $200,000 toward the purchase. In dispute, however, is how the proceeds of any sale of the land would be divided among them. The Oct. 28 TICA states at paragraph 6.3:

> If the Tenants have not formed a limited liability accompany prior to the disposition of the Property, *the Tenants shall be entitled to receive any amounts expended by such Tenants on the Property, including the original acquisition thereof*, prior to sharing of the profits of such disposition in accordance with the Percentage Interests.[6]

As defined in paragraph 1.1 of the Oct. 28 TICA, "Percentage Interest" refers to the Tenants "own[ing] the property in equal undivided percentage interests."[7]

The Nov. 1 TICA, countersigned by both MP and Prucres on November 1, 2005, further outlines the terms of the parties' business relationship. It also mentions the disposition of the proceeds of any land sold. The Nov. 1 TICA is the final version of a series of counter-proposals exchanged by Mitelhaus and McDonnell leading up to the TICA. Several of these proposed documents were admitted into evidence and the Nov. 1 TICA forms the basis for Prucres' argument that it should receive 50% of the sales proceeds.[8]

---

[5] Ex. B. These Agreements, each consisting of 4 pages, shall be collectively referred to as the TICA. When referenced separately the Agreements shall be identified as the Oct. 28 TICA or the Nov. 1 TICA.
[6] Ex. B, p. 2. Emphasis added.
[7] Ex. B, p. 1.
[8] Ex. B, pp. 5-8. California law applies here. Ex. B, p. 7, ¶ (l). In California, courts are encouraged to admit extrinsic evidence as part of the process of determining whether a document is ambiguous and needing construction or to show the parties' intended meaning.

4

Mitelhaus drafted the first version of the Nov. 1 TICA document; in it, he provided for the parties to receive repayment of their respective acquisition and development costs before splitting the profits 80% for Prucres and 20% for MP.[9] His version included a paragraph 2(c) that described "two scenarios" concerning the "final outcome" of the property. Clause 2(c)(1) sets out the forgoing 80-20 split to occur in the event the land is sold undeveloped and notes that Prucres already has a buyer for it. Clause 2(c)(2) describes a second scenario in which Prucres pays MP another $250,000 "so he has 50% of the purchase price." Prucres' payment is conditioned upon the closing of a separate and unrelated sale of property in Valencia, California—an acquisition that Mitelhaus brokered and which figures prominently in his objection to MP's claim. If the development is completed, at least to the point of having a Conditional Use Permit (CUP) and is then sold, each party would be reimbursed its 50% acquisition costs as well as any other costs it had incurred prior to the allocation of profits. Note that in both scenarios, the original investments of the parties will be repaid.

In the final version of the Nov. 1 TICA, paragraph 2(c) became 2(d) and the corresponding subpart (1) altered to change the profit split from 80-20 to 50-50. All that remains of subpart (2) is the sentence "A developer is sold the property at an agreed-upon price between Prucres and M-P Property Partners—90 Acres, L.L.C."[10]

---

*See George v. Automobile Club of Southern California*, 201 Cal. App. 4th 1112, 135 Cal. Rptr. 3d 480 (2011); *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 69 Cal Rptr. 561, 442 P.2d 641 (1968).
[9] Ex. A., pp. 2-3.
[10] Ex. B, p. 5.

5

This document is incorporated into the Oct. 28 TICA by a handwritten and initialed notation on its signature page.[11] A memorandum of the TICA was recorded in Los Angeles County along with the deed.[12] Prucres claims that the elimination of the body of former subpart (2) suggests an intent to divide the proceeds in some other manner, but I note that the concept of each party recovering its share of the acquisition cost is a constant in each draft or version of the TICA.

### The Development, its Finances, and MP's Claim

After the TICA was executed and the acquisition of the Property closed, the two tenants began to develop it. The TICA contained simple and clear provisions governing how the enterprise would do business. It provided for the establishment of a joint bank account or accounts and that all funds of the enterprise be deposited in them or paid out from them.[13] It also provided that all management functions would be conducted jointly.[14] Under the terms of the Nov. 1 TICA, the tenants would split all expenses, each paying half, and no expense would be incurred without being "signed off by both parties."[15] Under the "miscellaneous provisions" portion of the Nov. 1 TICA, subpart (h) provides that every amount payable by under the agreement would be "paid in lawful money of the United States" and subpart (s) notes that all costs of the enterprise would be paid within 30 days of the submission of invoices.[16] These provisions were almost immediately disregarded.

---

[11] Ex. B, p. 4.
**[12]** Ex. 50, p. 2-8 and Ex. C, pp. 2-4.
[13] Ex. B, p. 2, ¶ 3.1.
[14] Ex. B, ¶ 5.1.
[15] Ex. B, p. 6.
[16] Ex. B, p. 7.

6

In the fall of 2006, Mitelhaus opened a bank account at Union Bank for the Tenancy. Both he and McDonnell were authorized signers.[17] He paid some Tenancy bills from this account and others from his own account. Despite the provisions for equal and pre-approved payments above, the parties soon fell into a pattern of unilaterally paying for services when either received an invoice, making it difficult to track the relative contributions of each Tenant. Mitelhaus disputes the evidence about who paid what, but several things are pretty clear. Mitelhaus never provided McDonnell an accounting of expenditures in and out of the joint account or elsewhere. Both Mitelhaus and McDonnell paid development expenses from time to time, but not in equal amounts. McDonnell paid more than Mitelhaus did. When, after 5 years, McDonnell had still not obtained an accounting from Mitelhaus, MP sued Prucres in California state court asking not only for an accounting and associated relief, but eventually also asking that a receiver be appointed for the Tenancy.[18]

By sometime in 2008, McDonnell concluded that Mitelhaus had fallen behind in paying Prucres' share of the expenses. Prucres lacked funds to cover previous and future contributions. At the same time, another entity controlled by Mitelhaus had an opportunity to acquire an office building and needed some cash to accomplish that. McDonnell credibly testified that by November of 2008, Prucres was at least $45,000 behind MP in contributing to paying the Tenancy's expenses.[19] Mitelhaus testified that he wanted to borrow $80,000 in connection with acquiring the office building and

---

[17] Ex. 3, p. 66.
[18] Ex. 43, pp. 42-50; 84. The request for a receiver came on February 24, 2014, the same day this chapter 11 case was filed.
[19] See Ex. H, pp. 9-10.

7

enough more to cover past and future Prucres obligations to the Tenancy.[20] To that end, Prucres executed a note dated November 26, 2008 to MP and McDonnell for $135,000, to bear interest at 6 % per annum, payable monthly, with the principal being due and payable in one year.[21] Prucres secured repayment of the note with a Deed of Trust covering its interest in the Tenancy land.[22] Mitelhaus gave McDonnell six post-dated interest checks in the amount of $675 each to cover the first 6 months' interest. No other payments were ever made.

Prucres now denies owing any part of the note, claiming instead that its obligations to MP were satisfied by its performance on a "universal agreement" among a number of different counter-parties. According to Mitelhaus, in February of 2008, he learned of an opportunity to purchase at short sale an industrial/office building located on Avenue Stanford in Valencia, California. Acting as buyer's agent, he brought this opportunity to Discovery Land Ventures, LLC (DLV). DLV consisted of members Cornel Alvarado, Jon Reno, Nasir Eftekari, and Rafi Sarkesian. Alvarado owned William Rose and Associates Engineering, Inc. (WRA) and Reno was a project manager there. DLV negotiated the purchase of the Avenue Stanford property for $7.5 million, earning Mitelhaus a $150,000 commission at closing.[23] To close the deal, DLV needed more funds than it could borrow from a lender so Mitelhaus connected Reno and Alvarado with McDonnell. McDonnell agreed to lend DLV $450,000, to be guaranteed by **its** members. As part of the consideration for making the loan, WRA

---

[20] Ex. E, pp. 1-2.
[21] Ex. 80, pp. 4-6.
[22] Id., pp.7-10.
[23] Ex. 8, p.2.

8

agreed to render up to $120,000 engineering services on the Tenancy Property without charging the Tenancy. WRA also agreed to render a lesser amount of services on another project in which McDonnell had an interest, the Grapevine property.[24] WRA would become a tenant of the DLV building. Mitelhaus testified that he believed he'd satisfied the Prucres-MP obligation because he waived his buyer's agent commission on the sale of the Avenue Stanford property as well as his lessor's commissions in exchange for WRA agreeing to do the complimentary engineering work discussed above. According to him, part of the consideration for this was McDonnell's loan of $450,000 to DLV. In other words, Prucres' $135,000 liability was satisfied by his procuring the $120,000 of free work for the Tenancy Property.

There are real factual problems with his position. The first one is that NO writings were offered into evidence to memorialize the alleged "universal agreement." The TICA itself provided that any amendments to it must be writing.[25] WRA did enter into an Engineering Services Agreement that memorialized the free work provision in February 2009.[26] And, as noted above, Jon Reno wrote to John McDonnell offering the gratis services as an inducement to McDonnell's making the loan. But as for either concession somehow satisfying Prucres' liability to MP, the Engineering Services Agreement is silent; both Reno and McDonnell deny that this topic ever came

---

[24] *See* Ex. M, p. 27, Reno letter of intent.
[25] Ex. B, p. 3, ¶ 9.4 and p. 7, subparagraph (k) ("No oral agreements affect this Agreement . . .").
[26] Ex. M, p. 13. An Addendum to the engineering services agreement at page 20 memorializes these free services and specifies that it controls.

9

up.[27] Making matters worse for him, Mitelhaus admitted on cross examination that he actually received $145,000 in cash commission at the Avenue Stanford closing. Further, in his testimony, Reno denies that Mitelhaus ever procured any tenants for DLV. Even if he did, the record shows that all of the leases in force at this time yielded about $382,000 in annual rents.[28] Mitelhaus's commission on those leases was to be 6%. Six percent of $382,000 is $22,920, far less than the $135,000 Prucres note balance or the $120,000 WRA engineering commitment. There is simply no credible evidence supporting the existence of a "universal agreement" among these parties that would serve to satisfy Prucres' obligations to MP on the note.

Mitelhaus's credibility on this issue is further undermined by numerous e-mails between him and McDonnell concerning his failure to pay more than 6 months interest on the loan[29] and his being in default of paying the balance.[30] Even in April, 2011, when the loan was over a year delinquent, McDonnell was still writing to Mitelhaus in an effort to collect it.[31] In that communication, McDonnell noted that the loan's balance had "grown presently to a [sic] amount of approximately

---

[27] WRA's engagement contract contained an integration clause, rendering any verbal or oral agreements unenforceable. Ex. M, p. 4, ¶ 19. The Addendum to the Agreement is also silent regarding any "universal agreement." Finally, the First Amendment to the Engineering Services Agreement executed in September of 2009, makes no reference to the alleged "universal agreement" and also contains integration clauses. *See* Ex. M, pp. 21-22, ¶s 7-8.
[28] Rent Roll, Ex. 1, pp. 79-80.
[29] Ex. M, p. 37 (note attached to draft First Amendment dated September 8, 2009 wherein McDonnell writes: "…please send me monthly checks from July thru December at 675 for your loan payments.").
[30] Ex. K, p. 4, e-mail dated August 5, 2010 (". . . please indicate when we can get together and talk about our issues … [including] getting my loan paid…").
[31] Ex. K, p. 7, e-mail dated April 18, 2011 ("The loan was due to be paid by December 2009 and was not, which also was when payments were stopped on the loan [sic]").

$154,000."[32] In May of 2011, he referred the matter to a lawyer for collection; that lawyer sent Mitelhaus a demand letter on May 4, 2011.[33]

After this time, the two principals' communications became more vitriolic, predictably so after MP filed its accounting suit in Los Angeles County court. After the suit was filed and Mitelhaus learned of it, he wrote to McDonnell on June 27, 2013, stating "Let me be very clear: I do not owe you anything," and intimating that "I pay you back by getting you 1/2 of the price of the work done on the 90 acres…"[34] This letter also refers to Mitelhaus having waived commissions on the leases.

In the California litigation, McDonnell and MP sought an accounting and to enjoin Prucres from further violating the TICA. MP did not file an action on the Prucres $135,000 note or attempt to enforce the deed of trust. According to MP's proof of claim, Prucres was indebted to it on a secured claim in the amount of $157,875 and an unsecured claim in the amount of $59,930.02.[35] Assuming the note and deed of trust are legally valid and enforceable in this case, the evidence supports the secured claim in that amount. The note draws interest at 6% per annum, $675 per month, or approximately $22.20 per diem. Exhibit E contains an amortization schedule that reflects compounded interest from the date of the last payment, December 5, 2009 until February 24, 2014, the date of the petition, yielding a balance due on the note of $178,056.73.[36] The Note, however, doesn't provide for compound interest. Instead,

---

[32] Id.
[33] Ex. E, p. 7.
[34] Ex. 43, pp. 13-15.
[35] Ex. 80. (Claim 3-1 filed March 20, 2014).
[36] Ex. E, p. 8.

11

it provides, "Subject to the terms hereof, interest shall be computed on the whole amount of the principal Sum remaining from time to time unpaid, at the per annum rate of six percent (6%)..."[37] This requires that the Court calculate the balance due on the note as of the petition date, plus any late charges owing under the Note's terms. From the last interest payment on December 5, 2009 until the petition date, February 24, 2014, elapsed 1542 days. At $22.20 per diem, the accrued interest since that date equals $34,232.40, together with five $675 monthly missed interest payments (July-November) of $3,375, for a total principal and interest due of $172,607.40. Prucres missed five monthly interest payments of $675 from July thru November of 2009 plus a final principal payment of $135,000. These missed payments bear a late charge of 5 percent under the note. Five percent of $138,375 is $6,918.75. The total principal, interest, and late charges due as of the date of the petition is therefore $179,526.15. During final arguments, MP essentially abandoned the unsecured portion of its claim and I conclude that the evidence supporting the unsecured portion is at best unclear and contradictory. If MP's claim is legally allowable under 11 U.S.C. § 502, it will be allowed in the amount of $179,526.15.

## ANALYSIS

### Interpreting and Applying the TICA

California law applies to the interpretation of the TICA.[38] Even if there were no choice of law provision in the TICA, applying choice of law rules in this case would

---

[37] Ex. 80, p.4.
[38] The TICA contains a choice of law provision that specifies California law applies. Ex. B, p. 7, subparagraph (l).

12

Case 14-10284   Doc# 283   Filed 06/09/16   Page 12 of 18

result in California law governing this dispute. Federal courts look to the law of the forum state to determine substantive issues, including that state's choice of law rules.[39] In Kansas, courts look to the Restatement (First) of Conflict of Laws.[40] Restatement § 332 provides that the law in which the contract is made applies to its interpretation while § 358 provides that the law of the place of performance determines the manner and method of performance.[41] The TICA was drafted and executed in California, involved, among other things, the effects of the disposition of California real property, and was to be performed in California.

Prucres' reliance on parol evidence to support its claim that the parties agreed to divide the proceeds of the sale of the Property in equal shares is misplaced. California's extrinsic evidence rule is somewhat permissive in that it requires a court to consider such evidence in determining whether the contract is susceptible to the particular meaning advocated by a party, even where the agreement "otherwise is clear and unambiguous, and integrated."[42] But, the California Supreme Court makes clear that "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract."[43] Here, Prucres asked the Court to review a series of prior drafts of TICA and to construe from the parties' omission of the details

---

[39] *See Moses v. Halstead*, 581 F.3d 1248 (10th Cir. 2002).
[40] *Layne Christensen Co. v. Zurich Canada*, 30 Kan. App. 2d 128, 142, 38 P.3d 757, 766 (2002).
[41] *Id.* a 141-142; *see also Aselco Inc., v. Hartford Ins. Group*, 28 Kan. App. 2d 839, 21 P.3d 1011, *rev. denied* 272 Kan. 1417 (2001).
[42] *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644–46 (1968) (en banc), cited in *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 777 (9th Cir. 2003).
[43] *Pacific Gas & Elec. Co*, 442 P.2d at 645.

13

concerning the disposition of the Property after development that the parties had implicitly agreed to split the proceeds of the Property, each taking a half. Admitting the prior drafts complies with California's liberal parol evidence rule, but holding for Prucres would violate it. In each of the drafts, as in the final versions of both the Oct. 28 TICA and Nov. 1 TICA, the respective parties' right to be reimbursed for their share of the acquisition costs is a constant theme. To hold that the elimination of other provisions from previous drafts somehow changes that would be "detract from, or vary the terms of a written contract." The TICA clearly provides for each party to receive its share of the land's acquisition costs before profits are determined and shared equally. Because there were no profits, the land's net proceeds should be divided ratably between Prucres and MP based upon what each contributed to its purchase in 2005.

**The Objection to Claim**

MP's claim is presumed to be allowed and Prucres had the burden to bring evidence and argument sufficient to meet the presumptive validity of MP's claim.[44] Claims allowance is governed by § 502(b). Prucres claims that the claim should not be allowed because it is unenforceable under applicable law.[45] Prucres therefore had the burden of persuasion on the legal defenses it raised to MP's note and deed of trust. For various reasons, it failed to carry that burden.

---

[44] 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3007(a).
[45] 11 U.S.C. § 502(b)(1).

Prucres first argues that collection of the Note is barred by the California statute of limitations for enforcement of written contracts which is four years.[46] The Note matured on November 29, 2009 and, as of the date of the petition here, February 24, 2014, hadn't been enforced in court. Prucres says that the Note's lapse vacates MP's power to enforce its Deed of Trust by sale. This argument first returns us to Kansas' choice of law rules. Federal courts sitting in diversity apply the law of the forum concerning statutes of limitation if those statutes are procedural in nature:

> Under Kansas law, determination of the limitation period is governed by the law of the forum, *lex fori*. See *Green v. Kensinger*, 199 Kan. 220, 223, 429 P.2d 95 (1967). The United States Supreme Court has held that a forum state may apply its statute of limitations because it is procedural. See *Sun Oil Co. v. Wortman*, 486 U.S. 717, 721-729, 108 S. Ct. 2117-2125, 100 L.Ed.2d 743 (1988)" (emphasis added).[47]

Kansas statutes of limitation are procedural.[48] The Kansas limitation period for written contract enforcement is five years.[49] Five years had not run before Prucres filed its case here. Thus under the "applicable law" in Kansas, MP's claim is not time-barred and, assuming there are no other defenses, can be allowed.

Even if the California four-year statute applies, MP would still retain the lien granted by its Deed of Trust. While a Kansas mortgage securing a time-barred debt might no longer be valid, California deeds of trust have either a ten-year or 60-year limitations period, depending upon whether the last date for payment of the

---

[46] Cal. Code Civ. Proc. § 337.
[47] *See Graphic Technology Inc. v. Pitney Bowes, Inc.*, 968 F. Supp. 602, 605 n. 3 (D. Kan. 1997).
[48] *Harding v. K.C. Wall Prods. Inc.*, 250 Kan. 655, 668, 831 P.2d 958 (1992).
[49] KAN. STAT. ANN. § 60-511(1) (2005).

15

underlying obligation is ascertainable from the record.[50] California courts distinguish this statute from Cal. Civ. Code § 2911 which states that a lien is extinguished by the lapse of time within which in an action may be brought on the principal obligation. They generally hold that § 2911 may bar a judicial foreclosure of the deed of trust when the note lapses, but it does not bar exercising the power of sale that a deed of trust confers on the creditor.[51]

A power of sale is invoked by the beneficiary of the deed of trust, the creditor, demanding that the property be sold to pay the debt of the grantor, its borrower. It is a "charge or interest" in property to secure payment of a debt—a "lien" as that term is defined in the Bankruptcy Code.[52] And, even if Prucres is no longer liable personally to MP on the debt, a non-recourse claim that is secured by a lien is allowed as if the holder retained recourse under § 1111(b)(1)(A). The lien remains and is still enforceable against Prucres' interest in the Property. If, as here, the underlying security is sold under a plan or pursuant to § 363, the non-recourse creditor may still claim its right to credit bid.[53] Thus, the proceeds of the sale of Prucres' share of the Property, free and clear of liens, remain encumbered by MP's lien in the hands of the reorganized debtor under the terms of the Order Approving Sale.[54]

---

[50] *See In re Sukhu*, 107 B.R. 729, 730 (Bankr. N.D. Cal. 1989), interpreting Cal. Civ. Code § 882.020 providing that a deed of trust's lien expires only after 10 years following the last date for payment of the underlying debt.
[51] 107 B.R. at 732 (Though a mortgage may expire when the note does, "a power of sale under a deed of trust remains enforceable."). *See also Miller v. Provost*, 26 Cal. App.4th 1703, 33 Cal. Rptr.3d (1994).
[52] 11 U.S.C. § 101(37).
[53] *See* 11 U.S.C. § 1111(b)(1)(A)(ii); MP consented to the sale of the Property and did not credit bid.
[54] *See* Dkt. 210.

16

Debtor also relies on the defense of payment or accord and satisfaction. As noted above, Mitelhaus and Prucres claim that its obligation on the Note was satisfied by the "Universal Agreement." Prucres had the burden to demonstrate the formation and existence of that agreement and failed to do so. Moreover, Prucres and Mitelhaus have taken inconsistent positions in connection with that defense in other litigation. For example, on Schedule B of his personal chapter 7 bankruptcy filed in the Central District of California, Mitelhaus noted that he owned "Prucres, Inc. (5% of shares of corporation owning … a 50% interest in profits in a 90-acre parcel of raw land in Los Angeles County, *which is overencumbered*)."[55] That he deemed the land over-encumbered in 2011 belies his claim that the 2008 "Universal Agreement" absolved Prucres of its liability to MP on the Note.

### **Conclusion, Summary of Ruling, and Orders**

California law applies to the interpretation of the TICA. Even after considering the extrinsic evidence of the preliminary drafts of the final TICA, I do not find it to be ambiguous. It plainly provides that upon sale of the Property, and before the profits of the enterprise are divided 50-50, each Tenant shall be repaid its initial acquisition costs. The sale proceeds here amount to $800,000. The Tenants acquired the land for $950,000. There are no profits to divide. Rather, MP and Prucres are each entitled to their ratable share of the $800,000 after direct sale costs are paid. MP's share is not more than 79.29% of $800,000 or $634,320. Prucres' share is not more than 20.71% of $800,000 or $165,680.

---

[55] Ex. F, p. 9 (*In re Mitelhaus,* Case No. 2:11-bk-46565-EC (Bankr. C.D. Cal) filed Aug. 26, 2011). Emphasis added.

17

Collection of the promissory note from Prucres *in personam* is not barred by the five-year Kansas statute of limitations which, in accordance with Kansas conflict of laws principles, applies here. Even if the four-year California statute of limitations applies, enforcement of the lien of the Deed of Trust on Prucres' interest in the Property is not barred because California law allows for a power of sale to be enforced for a period of 10 years after the obligation it secures comes due. I conclude that as a matter of both bankruptcy and California law, MP has an *in rem* claim against Prucres that is allowable as though it were a recourse claim pursuant to § 1111(b)(1)(A). Its secured claim should be allowed in an amount up to $165,680, the value of Prucres' share of the Property after deducting the direct costs of sale.

Therefore, on the Proceeds Motion (Dkt. 208), MP or its financial intermediary shall be paid up to $634,320 representing its share of the Property's sale proceeds, and its lien on Prucres' share of the Property be transferred to the balance of the sales proceeds in the hands of the reorganized debtor. Prucres, Inc. is ORDERED to pay that amount to MP immediately upon the closing of this sale. The Proceeds Motion is GRANTED as described in this Order and Prucres' objection to MP's claim (Dkt. 207) is OVERRULED.

###